IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT
ATLANTA DIVISION

VINCENT MARTIN, SHERMAN BAKER, )
BRENT REYNOLDS, STEPHANIE C.        )
DAVIS and BETTY HASIN-AMIN, on     )
behalf of themselves and all other disabled )
persons similarly situated,                )
                                           )
      Plaintiffs,                    )
                                           )
v.                                         )
                                           )      CIVIL ACTION FILE NO.
                                           )      1:01-CV-3255-TWT
METROPOLITAN ATLANTA RAPID         )
TRANSIT AUTHORITY; NATHANIEL P. )
FORD, in his official capacity as General )
Manager and Chief Executive Officer of the )
Metropolitan Atlanta Rapid Transit     )
Authority,                                 )
                                           )
                                           )
      Defendants.                    )

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO ORDER DEFENDANTS TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT

COME NOW, the Plaintiffs and file this motion to order Defendants (hereinafter

collectively referred to as "MARTA") to show cause why MARTA should not be held in

contempt. In the alternative, the Plaintiffs ask the Court to consider whether other

enforcement mechanisms may be necessary and appropriate.

MARTA has failed to comply with the Court's prior orders regarding paratransit

services. The Court previously: 1) found that MARTA fell far short of meeting the

requirements of the Americans with Disabilities Act; 2) found that injunctive relief was necessary, and; 3) entered an injunction that contained very specific rules regarding the manner in which MARTA must operate its paratransit system. MARTA's compliance with this injunction was to be monitored by Plaintiffs' counsel (hereinafter referred to as "Monitors"). Although Monitors have repeatedly pressed for improved service, (see, e.g., Exh. A at A-3)[1], MARTA's operation of its paratransit system has consistently failed to meet the standards set in the Court's injunction. In fact, MARTA Paratransit's performance has sharply declined since the injunction was entered.   In fact, over the last 8 quarters MARTA's paratransit performance has deteriorated to a point that it cannot be characterized by any adjective other than "abysmal."

As will be explained in further detail below, the existing injunctions require, in part, that, "MARTA Paratransit shall make every effort to achieve and maintain an on-time performance rate of 100 percent;" that MARTA shall provide a sufficient number of prepared Paratransit vehicles and operators so that all eligible persons requesting Paratransit service can receive it on a 'next day' basis;" and, that, "MARTA's fleet of paratransit vehicles and number of paratransit operators shall be sufficient to provide for pickups to be scheduled at the time requested by the passenger."   At the time the Court entered the first injunction in 2003, MARTA Paratransit's "on time performance" was 90.5% -- a level of performance the Court found to be unlawfully inadequate. MARTA's

---

[1] Attachment A-3 to Exh. A includes a few of many such requests.

own performance tracking shows that MARTA Paratransit's rate of "on time performance" for FY14[2] and the first half of FY15 ranged between 84.6% and 77.93%. (See Exh. A at A-6). Indeed, information taken MARTA's own website shows on time performance of 81.85% for January 2015 and 77.2% for February 2015. (Exh. B at B-1)

Paratransit's rate of "missed trips"[3] has also been increasing, with a rates of 4.03% and 3.06% in the first two quarters of FY2015. Similarly, the rate of "trip denials"[4] has been high: 8.97% and 11.7% during the last two quarters for which we have data.  (Exh. A at A-6).  These numbers reveal that, at present, MARTA Paratransit riders experience a significant delay (or receive no transport at all) on one out of every five trips they make. Thus, thousands of persons who depend on MARTA Paratransit for their transportation are unable to consistently make it to work on time, to medical appointments on time, or to meet their friends and families at planned times.

The existing orders also established several minimum requirements for MARTA Paratransit's telephone reservation system. They provide that, "MARTA Paratransit shall

---

[2] MARTA's Fiscal Year begins on July 1st of the preceding year. For instance, MARTA's FY15 began on July 1st, 2014 and will end on June 30th, 2015.

[3] Under FTA regulations, a missed trip occurs when either the Paratransit vehicle either fails to show up for a scheduled trip or when the Paratransit vehicle arrives at the pickup location more than thirty minutes beyond the ready time and the passenger is no longer there or decides  not to take the trip. See section II(B), below.

[4] According to the FTA's definition, a "trip denial" occurs whenever a passenger calls the reservation line to schedule a ride a day or more before the planned trip but the Paratransit system cannot schedule a ride at the time the passenger calls.  See section II(C), below.

undertake to answer all customer telephone calls within three (3) minutes after being accepted …." Service records compiled by MARTA regarding the first two quarters of FY15 report that there was an <u>average</u> delay of over 4 minutes in answering Mobility Reservation Telephone calls, making it clear that calls are not being answered within the 3 minute window specified in the Order.(Exh. A at A-6). This and other clear shortcomings in MARTA Paratransit's telephone reservation system have not only been brought to MARTA's attention by Plaintiff's counsel but were also spelled out in a Federal Transit Administration ("FTA") evaluation issued in 2012. (FTA 2012 Report attached as Exh. A at A-1). MARTA acknowledged problems with its telephone reservation system in its response to the FTA, and promised to remedy these problems, but has nonetheless failed to bring its telephone reservations operation into compliance.

"[I]njunctions, including consent decrees, . . . are enforced through the trial court's civil contempt power." *Reynolds v. Roberts*, 207 F.3d 1288, 1298 (11th Cir. 2000) (citation omitted). A petitioner "must [first] establish by clear and convincing evidence that the alleged contemnor violated [a] court's earlier order." *United States v. Roberts*, 858 F.2d 698, 700 (11th Cir. 1988) (citation omitted). Once this prima facie showing of a violation is made, the burden then shifts to the respondent "to produce evidence explaining his noncompliance" at a "show cause" hearing. *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991). At the show cause hearing, the respondent is allowed to show either that he did not violate the court order or that he was

excused from complying. *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998). The respondent may be excused because of an "inability" to comply with the terms of the order. *Id.* To satisfy this burden, the respondent must "offer proof beyond the mere assertion of an inability." *Id.* (quoting *Watkins*, 943 F.2d at 1301). Instead, the respondent "demonstrate[s] an inability to comply only by showing that [it has] made 'in good faith all reasonable efforts to comply.'" *Id.* (*quoting Watkins*, 943 F.2d at 1301).

In this submission Plaintiffs present clear and convincing evidence that MARTA has persistently violated the terms of the Court's injunction, that the Plaintiffs' Monitors have repeatedly brought these violations to the attention of MARTA's representatives, and that an FTA Compliance Review has identified continuing, significant problems with the system's performance. The Plaintiffs submit that they have made a prima facie showing of multiple, significant, and persistent violations of the Court's injunction. The Plaintiffs accordingly ask the Court to require MARTA to produce evidence explaining its noncompliance at a show cause hearing.

## I.    The Terms of the Court Injunction Orders

In an October 7, 2002, Order this Court found MARTA in violation of the Americans with Disabilities Act, The Rehabilitation Act of 1973, and related DOT Regulations. The Court's findings were based in part upon the fact that MARTA failed to provide its paratransit riders with a level of service that was comparable to that MARTA

provided riders of its regular fixed route service. By separate Order, the Court required

MARTA to take a wide range of specific actions to bring its services for riders with

disabilities into compliance with the ADA.  The Court envisioned that injunctive relief

and proper monitoring would produce the required improvement to service levels for

paratransit riders. In addressing the four part test for the issuance of preliminary

injunctions, the Court found:

> The implementing regulations of Title II of the ADA lay out very specific
> requirements for the operations of public transportation services. Defendants have
> failed to comply with several of these requirements. …  An injunction is an
> appropriate mechanism to ensure that competing priorities do not overwhelm
> MARTA's obligation to comply with the ADA. Cupolo v. Bay Area Rapid Transit,
> 5 F.Supp. 2d 1078, 1985 (N.D. Cal. 1997). In the particular facts of this case, an
> injunction is an appropriate means of guaranteeing that recent improvements and
> service and plans for added personnel are carried through and do not once again
> become victims of competing priorities.

(October 7, 2002 Order @ p. 45-46). And, in addressing the public interest element of the

test for the issuance of preliminary injunctions, the Court stated:

> Congress stated in the enactment of the ADA that it is in the public interest to
> eliminate discrimination against individuals with disabilities. See, 42 U.S.C.
> §12101. Granting the preliminary injunction would serve that public interest in
> providing accessible transportation to individuals with disabilities throughout
> metropolitan Atlanta. The public has an interest in full participation of the disabled
> in the economic, social and recreational life of the community. Tugg v. Towey,
> 864 F. Supp. 1201, 1211 (S.D. Fla. 1994). . . . issuing a preliminary injunction to
> ensure equal access to public transportation for individuals with disabilities is in
> the public interest.

(October 7, 2002 Order @ p. 46-47). The Court's injunction specifically required that

extensive records be kept, that MARTA make "every effort" for MARTA Paratransit to

achieve and maintain an on-time performance rate of 100%, and that MARTA provide a sufficient number of prepared Mobility vehicles and operators so that eligible persons can receive Mobility service on a next-day basis and at a service level comparable to that of its fixed route system.

The Court's injunction has been amended. One amendment addressing "On Time Performance" in "Paratransit Services" was made on July 17th, 2007. (7/19/07 Order at 5-6)  Pursuant to this amendment, MARTA was required to exercise its best efforts to comply with the recommendations made by third-party consultant TranSystems in a "Final Memorandum". (Exh. A at A-2). One of TranSystems' findings was that MARTA should determine its budget in each coming year (and decide the numbers of paratransit vehicles and paratransit operators that would be needed in that year) through applying certain formulas to its estimated ridership. A second change was made in recognition of the fact that the system's on-time performance rate had declined each year: MARTA agreed to add a provision specifying that it would utilize its best efforts to have at least certain specified numbers of paratransit vehicles and operators ready and available for daily service by July 1, 2007, and a higher number ready and available for daily service use as of July 1, 2008. MARTA failed to meet these deadlines, however.

Although the 2007 Amendment specified some minimum numbers of paratransit operators and vehicles that MARTA was to place in service by certain dates, the injunction still required MARTA Paratransit to make every effort to achieve and maintain

an on-time performance rate of 100 percent, to maintain a sufficient capacity to provide paratransit service to all eligible persons requesting it, and to provide such service on a "next day" basis.

The parties agreed to make another amendment to the injunction in 2014. This amendment recognized that MARTA had come into compliance on some issues and that some changes in the injunction were also needed to reflect changes in MARTA's standard operating procedures. The 2014 amendment did not change MARTA's underlying obligations regarding MARTA Paratransit's On Time Performance Rate or capacity.

Between 2007 and 2014 the performance by MARTA's paratransit system had continued to lag, with "on time performance" rates staying between 82%-88%. MARTA continued to ignore the expert advice it had received from TranSystems regarding its budgeting process and continued its failure to provide sufficient numbers of paratransit vehicles and paratransit operators to meet demand. As a result MARTA's paratransit performance has deteriorated to abysmal levels.

## II.   MARTA Paratransit's Performance Fails to Meet the Standards Mandated by the Court's Injunction

The Court-appointed Monitors have been reviewing the performance of MARTA's services for riders with disabilities for the past 12 years. As will be discussed below, MARTA has allowed the performance of its paratransit operations to deteriorate to a

level far below where the system's performance was when the Court initially issued its injunction. MARTA continues to refuse to provide the resources needed to run the system, allocating a smaller percentage of its funding to its paratransit budget than have other large transit systems. In sum, MARTA Paratransit fails to provide its patrons with service levels comparable to the service levels MARTA's fixed route riders enjoy.

## A.   Poor "On Time Performance" Scores for MARTA Paratransit

When the Court entered the first injunction in this case it found that one of the key indicators of MARTA Paratransit's inadequate service was the system's poor rate of "on time performance". The system's "on time performance" rate at that time was 90%. MARTA's own performance tracking shows that in subsequent years MARTA Paratransit's "on time performance" rate has dramatically **decreased** since the lawsuit, going from 90.5% in FY02 to 84.6% in FY14. It is particularly troubling that between FY13 and the FY14 MARTA's "on time performance" rate declined by over 3%. Although an "on time performance" rate of 84.6% is clearly unacceptable, MARTA Paratransit's performance since that date has deteriorated even further: during the first half of FY15 its monthly performance has ranged between 85.2% and 77.9%.[5]

---

[5] Since June of 2014 MARTA's Paratransit performance has been, on a monthly basis, as follows: July 2014, 85.2; Aug 2014, 80.1; Sept 2014, 79.3; Oct 2014, 77.9; Nov 2014, 82.9; Dec 2014, 83.5, Jan 2015 81.85; Feb 2015, 77.42. See Exh. A, attachment A-6 and Exh. B, attachment B-1).

It is worth noting that for a trip to be considered "on time," MARTA Paratransit need not arrive precisely at the pickup time given the rider. Instead, if the MARTA Paratransit vehicle arrives up to thirty minutes after the pickup time, the pickup is counted as an "on time performance". Thus, for instance, the 77.9% "on time performance" rate the system had in October of 2014  means that MARTA Paratransit vehicles arrived  more than thirty minutes past the negotiated ready times in 22.1% of their pickups.

## B.    MARTA Paratransit's "Missed Trips"

Further evidence of a capacity constraint is found in MARTA Paratransit's troubling performance numbers regarding "missed trips". Under FTA regulations, a missed trip occurs when the paratransit vehicle either fails to show up for a scheduled trip or when the paratransit vehicle arrives at the pickup location more than thirty minutes beyond the ready time and the passenger is no longer there or decides not to take the trip. MARTA has reported missed trip rates between 2.57% and 4.03% during FY14 and the first half of FY15. These rates represent **9438 "missed trips"** during the first half of FY15.  (Exh. A at A-6).

"Missed trips" constitute a particularly devastating form of service denial. Each "missed trip" represents an occasion when a passenger was promised that a ride would be provided, made plans in reliance on receiving the promised transportation, and waited for their ride through the entire thirty minute window only to be left without transportation.

Such passengers are not provided with advance notice of the system's lack of capacity and therefore have no opportunity to attempt to arrange alternative transportation. They run the risk of missing a special occasion, being late to work, or missing a medical appointment.

### C.     MARTA Paratransit's Rates of "Trip Denials"

The Court's Orders require MARTA to have a sufficient number of Paratransit vehicles and operators available to provide service requested by Paratransit passengers on a next day basis: i.e., MARTA Paratransit must maintain sufficient capacity to operate its Paratransit system without "trip denials". According to the FTA's definition, a "trip denial" occurs whenever a passenger calls the reservation line to schedule a ride a day or more before the planned trip but the Paratransit system cannot schedule a ride at the time the passenger calls.  The FTA has made it clear (both in relevant regulations and in its 2012 review of MARTA's Paratransit system), that a pattern of "trip denials" constitutes a capacity constraint.

For a number of years MARTA reported that it was not experiencing any "trip denials". (See Exh. A at A-6). During an FTA review, however, that agency determined that MARTA had used an incorrect definition for "trip denials" when recording its performance. When MARTA implemented the correct definition for "trip denials" in its reporting, its percentage of "trip denials" climbed from 0% to 11.7%. (See Exh. A at A-1).

MARTA schedulers are unable to schedule trips at the times requested because MARTA has failed to adequately expand its numbers of paratransit vehicles and operators to meet the needs of its ridership. The existence of such a significant pattern of "trip denials" provides clear evidence of a capacity constraint. The system's lack of capacity leaves its paratransit passengers without assurance that when they need to schedule a trip, one will be available. Passengers on the fixed route system do not face such uncertainty – one of the several ways in which MARTA has failed to provide the comparable paratransit service required by the existing injunctions.

### D.   Shortcomings In MARTA Paratransit's Telephone Reservation System

The *Martin* Orders require MARTA to meet certain service standards regarding its handling of phone calls from Paratransit customers. The Order, as modified in 2014, provided, in relevant part, that, "MARTA Paratransit shall undertake to answer all customer telephone calls within three (3) minutes after being accepted …." (Order Modifying MARTA's Injunctive Requirements, entered 06/25/14 @ 6-7).

Service records compiled by MARTA regarding the first two quarters of FY15 report that there was an <u>average</u> delay of over 4 minutes in answering Mobility Reservation Telephone calls. Such an average suggests that half or more of the incoming calls are not answered within the 3 minutes required by the injunction and, at a minimum, makes it clear that often calls are not being answered within the specified 3 minute window. Roughly 8-9% of calls to the reservation line were abandoned, indicating that a

sizeable number of callers became discouraged by the wait and gave up. These metrics fall well below the performance standards MARTA has set for itself. (Exh. A at A-1, p. 53)  These performance numbers also provide further evidence that a capacity constraint exists in the system. As the FTA explained in its 2012 report, "Experiencing significant telephone delays to place or confirm trip requests or to check on rides could discourage people from using the service and could therefore be considered a form of capacity constraint." (Id).

The FTA's 2012 report also found another significant problem regarding MARTA Paratransit's operation of its telephone reservation system: "The weekend and holiday hours for making reservations do not meet the requirements under §37.131(b)(1) of the DOT ADA regulations." These regulations require MARTA to provide reservations service during times that are comparable to normal business hours even on days that its administrative office is not open. The FTA found that MARTA did not have such reservations telephone service available on weekends and holidays; instead, callers are asked to leave their name and number on voice mail and wait for a return call. (Exh. A at A-1 p. 31). In the "Corrective Action Plan" that MARTA submitted in response to the report, it said that it had drafted a plan to allocate resources for additional staff to make extended weekend and holiday hours available for telephone reservations "by the end of the calendar year". This Plan was sent to the FTA on September 30th, 2013, but evidence

shows that the system still only offers a voice mail / call back system on weekends. [Exh. B ¶21]

MARTA Paratransit's weekend reservation system is inaccessible to many riders. Patrons who leave a message often must wait several hours before receiving a call back. In addition, on weekends, the reservations staff will only process requests for next day pickup. Thus, a patron who calls on Saturday to schedule a ride for Monday will not be allowed to make the reservation and will have to call back on Sunday. Finally, if a patron has a speech impediment, it can be difficult to leave a message that is sufficient to allow for a call back.

Clear shortcomings in MARTA Paratransit's telephone reservation system were identified by the FTA in 2012 and reflected in MARTA's own data before and since that review. MARTA Paratransit has nonetheless failed to bring its telephone reservations operation into compliance, however.

### E.    The "Undersized" Volume of MARTA's Paratransit Service Relative to that in Other Cities Provides Further Evidence of Capacity Constraints

The inadequate level of service provided Paratransit riders is not only reflected in the poor performance statistics detailed above but also in the fact that the ridership levels for MARTA paratransit are far below the levels that should exist for a metropolitan area the size of Atlanta. The system's poor service has a chilling effect on whether persons eligible to use MARTA Paratransit's services actually use such services.

TranSystems (a consulting firm retained to provide expert advice to MARTA regarding its operation of MARTA Paratransit) found in a 2006 evaluation that, "Clearly, MARTA's paratransit service is 'undersized' compared to [comparable transit systems] and ridership can be expected to grow for several years to come once service quality is improved to meet desired standards. … [It] seems relatively clear that demand for service has been constrained in recent years." (Exh. A at A-2 p. 4-6) Similarly, the FTA found in its 2012 evaluation of MARTA Paratransit that the system's ridership during FY2009 was approximately twenty percent lower than the estimated demand for Paratransit services in MARTA's service area. (Exh. A at A-1 p. 107)

### F.   The Overall Level of Service MARTA Paratransit Currently Provides Its Riders Falls Far Short of Meeting the Requirements of Either the Injunction or the ADA

The numerous shortcomings in MARTA Paratransit service described above have prompted many potential riders to give up on trying to use the system. These individuals are forced to stay home, rely on family and friends for transit, or incur high costs from private transit vendors. MARTA has failed to provide its actual and potential paratransit riders with the complementary transit service envisioned by this Court's injunction order and by the Americans with Disabilities Act.

### III.   MARTA Has Repeatedly Failed To Use Available Resources to Improve Paratransit Performance

Although a respondent's inability to comply with the terms of a court order provides a defense against a contempt action, it is not enough for a respondent to simply assert an inability to comply: such a defense must be proven. The respondent must show that it has made "'in good faith all reasonable efforts to comply.'" *Chairs*, 143 F.3d at 1436 (*quoting Watkins*, 943 F.2d at 1301). MARTA cannot prove such a defense of inability here because the system has repeatedly failed to apply resources it had available toward addressing MARTA Paratransit's performance problems.

### A.   MARTA Has Persistently Failed to Budget and Plan for Anticipated Ridership

Under the 2007 amendment to this Court's injunctions, MARTA was required to exercise its best efforts to comply with the recommendations by TranSystems to base its paratransit budget on data-based estimates of ridership and calculations of what is needed to serve the anticipated demand. The Monitors have repeatedly urged MARTA officials to do this. MARTA's Paratransit budget has not reflected this type of planning, however, a deficiency noted in the 2012 FTA report. The Report first noted that the Mobility Program Director had developed a budget for FY09 by estimating ridership for the upcoming year, estimating the number of vehicle-hours that would be required to serve the projected ridership, and then using this number to estimate the division staffing and equipment needs -- a methodology similar to that recommended by paratransit consultant

TranSystems. As the FTA observed, however, the budget ultimately provided did not square with the calculations made:

> Interestingly, while a ridership increase of 10 percent was projected, and an 8 percent increase in revenue hours was included, the direct net operating budget increased by less than 1 percent between FY2008 and FY 2009. MARTA staff could not explain why the approved budget for FY 2009 had not been more in line with the revenue-hour increase.
>
> The review team noticed that while the direct net operating budget had increased by 7 percent between FY 2007 and FY 2008, the approved head count had not increased at all. In addition, even though an 8 percent increase in revenue-hours had been projected for FY 2009, the approved head count at the beginning of the year was again not increased over the FY 2007 or FY 2008 levels.

(Exh. A at A-1 §10.7).

Since FY12 – a year when MARTA Paratransit's "on time performance" had **dropped** to 87.4% -- the budget changes for Paratransit year to year have been as follows:

FY13 change from FY12 = -0.59%
FY14 change from FY13 =  0.99%
FY15 change from FY14 = -0.91%

Two years of decreased funding and one year with an increase of less than 1%!  These funding decisions by MARTA reflect a clear lack of commitment to their obligations under the Court's order and the ADA. Meanwhile, the lack of feasible alternative transportation has caused MARTA Paratransit's ridership to increase over the years, from 289,258 trips in FY08 to 470,872 in FY14.

It is also important to note that MARTA finished FY13 with a budget surplus of $9 million. Rather than invest this money into improved paratransit services, however, MARTA used the funds to increase the frequency of fixed route trains and buses. In essence, MARTA decided to shorten the wait times for fixed route passengers by five minutes rather than honoring the Court's mandate to reduce the far more egregious service delays and failures being experienced by its paratransit patrons.

It appears that MARTA's allocation of funds towards its paratransit program has been undermined by its prioritization of the needs of its fixed route customers. This choice by MARTA is precisely what this Court warned against when it entered injunctive relief. As the Court found, an injunction provides an appropriate means of guaranteeing that MARTA's riders with disabilities did not once again become the victims of the agency's competing priorities. (October 7, 2002 Order p. 46).

### B.   MARTA's Funding for Paratransit Services is Lower than the Funding Provided by Other Large Public Transit Systems

Although improved efficiency can help a transit system obtain "more bang for the buck", MARTA must invest a baseline amount of funding into its paratransit services in order to achieve the performance required by the injunction. When the percentage of total operating budget that MARTA devotes to paratransit is compared to the percentage other transit systems allocate to their paratransit services it becomes even clearer that MARTA is failing to provide MARTA Paratransit with adequate resources. For example, in FY10

MARTA allocated 2.65% of its total operating budget to its paratransit services. In the same time frame, the national average for the proportion of funds allocated by transit systems to their paratransit services was 10.9%.[6]  A survey of transit systems performed by the federal Governmental Accountability Office found that in 2007 and 2010 the average portion of transit operating budgets allocated to paratransit was 18%.[7]

Similarly, a 2004 report comparing the amounts of money spent on paratransit showed that, in comparison to other systems, MARTA spent smaller sums on Paratransit:[8] MARTA spent $8.338 million on paratransit in 2004, while Greater Cleveland RTA and Capital Metro Transit Authority in Austin, TX spent $14.867 million and $14.867 million, respectively, even though those transit systems had smaller overall operating budgets. MARTA spent only 2.48% of its operating budget on paratransit services, while Greater Cleveland RTA spent 6.88% and Capital Metro Transit Authority in Austin, TX spent 12.96%. Operating a paratransit service simply costs more per revenue mile than fixed route service. MARTA, like other transit systems, must be willing to pay those costs to comply with the law.

---

[6] *It's Time to Rethink how We Do Transit, http://www.dartfirststate.com/rightfit/pdf/dart_brochure.pdf (Published by Delaware Area Rapid Transit).*
[7] *Survey of Transit Agencies Regarding Paratransit Services,* U.S. Governmental Accountability Office. http://gao.gov/special.pubs/gao-13-18sp/results.htm#question_151
[8] *The Future of Disability in America,* Committee on Disability in America, Board of Health Services Policy, Institute of Medicine, 2007, p.538-542 (accessed via Google Books).

### C.   MARTA Persistently Fails to Secure Adequate Numbers of Paratransit Operators and Vehicles

MARTA's inability to provide an adequate level of paratransit service was caused in part by its insufficient numbers of paratransit operators and vehicles available on a daily basis. For example, MARTA's "on time performance" dropped from 88.6% to 82.6% between the second quarter of FY13 and the third quarter of FY14, when the number of available vehicles and the number of available operators decreased. (See Exh. A at A-6).

Both the FTA and TranSystems have repeatedly pointed out the linkage between numbers of available operators and vehicles and the level of service quality achieved. (See Exh. A at A-2 p. 4) Similarly, the FTA reported in its 2012 Compliance Review that, "The review of the pullout records for this sample week indicated that MARTA had a chronic shortage of available drivers. Between 1 and 9 percent of scheduled runs appeared to be regularly closed due to driver shortages. This led to many same-day add-ons, overly tight schedules, and late and long trips." FTA 2012 at 104. Statements made by MARTA Paratransit employees confirm that a primary cause of poor "on time performance" is a shortage of available Paratransit Operators. (See Exh. A at A-1, pp. 24 & 82.)

It is apparent that there is a direct correlation between the number of Paratransit vehicles and Operators on the road every day and the quality of MARTA Paratransit's

performance. Any attempt to significantly improve performance numbers without providing the number of vehicles and operators that are needed for the system's ridership is like trying to build bricks without straw.

## IV.   Plaintiffs Made Extensive Efforts to Bring MARTA into Compliance Before Seeking Court Intervention

MARTA has been repeatedly informed that it is failing to devote sufficient resources to Paratransit services, particularly in terms of number of vehicles and operators needed to meet demand. During numerous meeting with MARTA officials (and in follow-up correspondence), the Monitors have urged MARTA to: (1) follow the recommendations of the 2006 TranSystems Final Memorandum, as required by the 2007 amendment; (2) budget based upon actual and expected increases in ridership as opposed to step increases that are tied to inflation or undermined by prioritizing the fixed route system; and (3) increase the number of operators and vehicles in numbers sufficient to alleviate the capacity constraints within Paratransit, using the methodology suggested by TranSystems and the FTA. MARTA's typical response has been promises that performance will get better soon. (See, e.g., Exh. A-3)

The FTA's 2001 compliance review of MARTA's Paratransit operations included 24 findings of noncompliance by MARTA. (Exh. A-1 p.10-11). At least half of the shortcomings the FTA identified in 2001 concerning MARTAs Paratransit's operation

still exist today, and a number of those noted deficiencies are more significant than they were in 2001. (See Exh. A-1 p. 10-11)

In recent months the Monitors have pressed much harder for solid improvement, calling for the system to respond to its plummeting performance statistics with quick, significant and aggressive action. At the same time, the Monitors repeatedly expressed willingness to carefully consider any response MARTA wished to make, and to work with MARTA to find a solution. After reviewing MARTA's responses and proposed course of action, however, the Monitors sent MARTA formal notice of their intent to seek the Court's intervention if the parties were not able to reach agreement on a solution. (Exh. A-5).  The Monitors met again with MARTA officials and genuinely attempted to find common ground, but once again MARTA officials were unwilling to offer the type of concrete, enforceable promises that the situation demanded. The Monitors accordingly felt that they were left with no choice but to seek relief from the Court.

## V.    MARTA's Current Exploration of Privatization Is Not an Adequate Response

It appears likely that MARTA will respond to this motion with an argument that it is currently soliciting bids from private entities interested in operating a large portion of its MARTA Paratransit system. "No Court action is needed," MARTA may argue, "because we are hiring a private vendor who will fix everything!"  This argument fails, however, for several reasons.

First, such an argument would fail to recognize that even under the privatization proposal, MARTA would continue to operate Mobility's telephone reservation system. MARTA has been repeatedly urged to mend the problems with its operation of the telephone reservation system and has failed thus far to take any steps to do so. Those problems will apparently remain regardless of the outcome of the RFP.

Second, MARTA has issued a "Request for Proposals," (or "RFP"), for the operation of portions of its MARTA Paratransit system, but has made it clear in both the RFP itself and in their statements to the Monitors that MARTA may ultimately decline to enter into any contract at all. (RFP at Part 1, §5) So, they may go through the whole process but then end up continuing to operate the entire system in-house, i.e., the status quo.

At this point, there is very little concrete information regarding what any potential contract would look like and how likely it would be to produce improved paratransit performance. It is also impossible to know at this point whether any vendor that is eventually selected will have the necessary expertise and experience to competently manage portions of MARTA Paratransit. In the end, there may not be a well-crafted bid from a competent provider with a strong track record of good performance. Alternatively, such a provider may submit a bid, only to be rejected in favor of a less qualified but lower-priced competitor. MARTA's lengthy track record of failing to provide its

paratransit system with the funding it requires makes it essential that its selection of a paratransit vendor be done under close Court supervision.

In addition to these general concerns, the Monitors have additional, specific concerns regarding the current RFP: e.g., the failure of the RFP to mention the existence of this Court's injunctions; the small size of the financial incentives and disincentives the RFP provides to encourage the vendor to meet the requirements of the consent order; the conflicting statements the RFP makes concerning whether the service to be provided by the Contractors is curb to curb service or door to door service; and the fact that bidders are asked to propose a price for a certain number of vehicle revenue hours over the life of the contract without providing for an increased number of hours over time.

It should be noted that while MARTA can privatize some tasks involved in its provision of paratransit services, it remains responsible for complying with this Court's injunction and cannot delegate that duty. If MARTA enters into a contract, however, the vendor selected and the terms of the agreement will have a direct impact on the quality of MARTA's paratransit services for years. Thus, now is the best time for increased Court intervention and scrutiny, rather than after a contract is signed.

## VI.   Conclusion and Prayer for Relief

This Court's existing injunction requires MARTA to make **all** efforts to achieve "on time performance" of one hundred percent and to operate its Paratransit system without other capacity constraints. MARTA Paratransit patrons are entitled by law to a

system that meets service standards comparable to those provided customers of fixed route. The materials submitted with this motion demonstrate that MARTA has failed to exert their best efforts to meet these mandates of the Court's order and the applicable law.

For all the foregoing reasons, the Plaintiffs respectfully request that this Court order this case set for a hearing at which MARTA may show cause as to why they should not be held in contempt. If the Court holds Defendants in contempt, the Plaintiffs request that the Court impose monetary sanctions until compliance is attained and mandate that Defendants submit to the Court a plan to bring themselves into compliance. The Plaintiffs further request that in the event MARTA fails or refuses to pay the attorney fees and expenses reasonably incurred in bringing this motion or conducting additional monitoring, the Court award such fees and expenses, and provide such additional relief as the Court deems proper.

Respectfully submitted this _____ day of May, 2015.[9]


                       ___/S/ Georgia Lord_____
                       GEORGIA K. LORD
                       Georgia Bar No. 447932

GEORGIA LORD LAW
75 Fourteenth Street
Suite 2840
Atlanta, Georgia 30309
Telephone No. (404) 888-3738
Fax: (404) 888-3731
Email: Georgia@GeorgiaLordLaw.com


                       _/S/ David C. Ates_____
                       DAVID C. ATES
                       Georgia Bar No. 026281

DAVID ATES, P.C.
805 Peachtree Street, Suite 613
Atlanta, GA  30308
Telephone: (404) 382-5324
Facsimile: (404) 393-5082
Email: ates_david@live.com


                       _William L. Nabors, Jr.____
                       WILLIAM L. NABORS, JR.
                       Georgia Bar No.

3355 Lenox Road Suite 750
Atlanta, GA 30326
Telephone: (678) 510-1730
Email: william@naborstrustlaw.com

---

[9] Pursuant to Local Rule 7.1, undersigned counsel hereby certifies that this document has been prepared in compliance with Local Rule 5.1(B).

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT
ATLANTA DIVISION

| | |
|---|---|
| VINCENT MARTIN, SHERMAN BAKER, )<br>BRENT REYNOLDS, STEPHANIE C. )<br>DAVIS and BETTY HASIN-AMIN, on )<br>behalf of themselves and all other disabled )<br>persons similarly situated, )<br>)<br>     Plaintiffs, )<br>)<br>v. )<br>)<br>METROPOLITAN ATLANTA RAPID )<br>TRANSIT AUTHORITY; NATHANIEL P. )<br>FORD, in his official capacity as General )<br>Manager and Chief Executive Officer of the )<br>Metropolitan Atlanta Rapid Transit )<br>Authority, )<br>)<br>)<br>     Defendants. ) | CIVIL ACTION FILE NO.<br>1:01-CV-3255-TWT |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 13, 2015, I electronically filed the foregoing **Brief in**

**Support of Motion for Order to Show Cause** with the Clerk of the Court using the

CM/ECF System and that Defendants' below listed Counsel received notification via the

Court's electronic filing system:

Ms. Paula Morgan Nash
Chief of Litigation & Administration
MARTA Legal Department
2424 Piedmont Road, NE
Atlanta, GA 30324

_____/S/ David C. Ates_____
David C. Ates